# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

FULTON       COUNTY       EMPLOYEES'    )
RETIREMENT SYSTEM,                       )
141 Pryor Street SW                      )
Suite 7001                               )
Atlanta, GA 30303-3477                   )
                                         )
Individually  and  on  Behalf  of  All  Others  )
Similarly  Situated,                     )
                                         )
                         Plaintiff,      )
                                         )   Case No.
            v.                           )
                                         )   **CLASS ACTION**
MALLINCKRODT PLC,                        )
675 McDonnell Blvd.                      )   **COMPLAINT FOR VIOLATIONS OF**
St. Louis, MO 63042                      )   **THE FEDERAL SECURITIES LAWS**
                                         )
MARK TRUDEAU,                            )   **DEMAND FOR JURY TRIAL**
c/o Mallinckrodt  plc                    )
675 McDonnell  Blvd.                     )
St. Louis, MO 63042                      )
                                         )
MATTHEW K. HARBAUGH,                     )
c/o Mallinckrodt  plc                    )
675 McDonnell  Blvd.                     )
St. Louis, MO 63042                      )
                                         )
                         Defendants.     )
                                         )

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION ................................................................................. 1

II.   JURISDICTION AND VENUE ........................................................................... 6

III.  PARTIES ............................................................................................................. 6

IV.   SUBSTANTIVE ALLEGATIONS ..................................................................... 8

      A.    The Fraud Begins: Mallinckrodt Acquires Questcor ............................ 8

      B.    Defendants' Materially False and Misleading Statements ................... 9

      C.    The Full Extent of Mallinckrodt's Fraud Is Finally Revealed ............ 18

V.    CLASS ACTION ALLEGATIONS ................................................................... 21

VI.   UNDISCLOSED ADVERSE FACTS ............................................................... 23

VII.  LOSS CAUSATION .......................................................................................... 24

VIII. SCIENTER ALLEGATIONS ........................................................................... 26

IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET
      DOCTRINE ....................................................................................................... 26

X.    NO SAFE HARBOR .......................................................................................... 28

XI.   COUNTS AGAINST DEFENDANTS .............................................................. 28

      COUNT I ........................................................................................................... 28

      COUNT II .......................................................................................................... 32

XII.  PRAYER FOR RELIEF .................................................................................... 33

XIII. JURY TRIAL DEMANDED ............................................................................. 34

Plaintiff Fulton County Employees' Retirement System ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by Mallinckrodt plc ("Mallinckrodt" or the "Company") and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on Mallinckrodt's website concerning the Company's public statements; and (d) review of other publicly available information concerning Mallinckrodt and the Individual Defendants.

## I.     NATURE OF THE ACTION

1.      This is a class action on behalf of all persons or entities that purchased or otherwise acquired Mallinckrodt securities between July 14, 2014 and January 18, 2017, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Mallinckrodt is a specialty pharmaceutical company that develops, manufactures, markets and distributes branded and generic pharmaceutical products and therapies.

3.      Mallinckrodt engaged in a secret and unlawful scheme designed to eliminate all competition for the Company's key drug, H.P. Acthar Gel ("Acthar"), which accounted for as much as 34% of the Company's revenue during the relevant time period. The Company was able to eliminate competition by acquiring the rights to Acthar's sole competing drug, Synacthen Depot ("Synacthen"), and then proceeded to shut down development and production of that drug.

4.      With Acthar's only potential competition sidelined, Mallinckrodt was able to increase the price of the drug exponentially.    Between 2001 and 2016, a vial of Acthar rose in price from a cost of $40 to more than $34,000—an astonishing increase of 85,000%.    This massive increase led Acthar to become the single most expensive drug reimbursed by Medicare and Medicaid per user, and cost those programs and therefore taxpayers nearly $650 million in 2015 alone.    Fueled by Acthar's explosive growth, Mallinckrodt's revenues and profits more than doubled during the Class Period, and the Company's stock price rose concomitantly, reaching a high of $132.51 per share on March 18, 2015.

5.      As was recently disclosed, however, Mallinckrodt's purportedly successful business model was a sham.   In reality, the Company was only able to sell Acthar for such high prices because it engaged in illegal anticompetitive conduct in violation of federal antitrust laws. The Company also effectively defrauded Medicare and Medicaid by charging prices that were inflated by the fraudulent conduct.   Moreover, the Company and its executives affirmatively lied to investors regarding the true extent of Acthar's reliance on Medicare and Medicaid, falsely assuring the market that Acthar was nowhere near as dependent on reimbursements from the federal government as it in fact was.

6.      Information regarding Mallinckrodt's illegal and fraudulent business practices has been slowly divulged to investors in piecemeal fashion since August 4, 2015, when the Company first cut its Acthar sales forecast due to mounting pressure from health insurance companies and other payers over the drug's exorbitant cost.   Mallinckrodt's stock price declined 14% on August 4, 2015 as investors began to question the sustainability of Acthar's price increases and the source of the Company's revenue stream.   At the time, soaring drug prices were a hotly debated issue, with government officials on both sides of the political spectrum vowing to crack down on

skyrocketing prices.   As a result, a major source of concern for Mallinckrodt shareholders throughout the Class Period was the Company's increased reliance on Medicare and Medicaid to support its Acthar sales.

7.     On October 6, 2015, during a guidance conference call with analysts and investors, Mallinckrodt executives were asked about Acthar's exposure to Medicare.  Defendant Mark Trudeau ("Trudeau") indicated that Mallinckrodt's combined revenues from Medicare and Medicaid constituted roughly 25% of the Company's total revenues, and that the proportion of Acthar revenues attributable to Medicare and Medicaid was "a little higher than that."

8.     The truth about the Company's dependence on Medicare and Medicaid for Acthar revenue began to surface on November 9, 2015, when Citron Research ("Citron"), a notable short seller best known for exposing the fraud at Valeant Pharmaceuticals International, Inc. ("Valeant"), stated on Twitter that Mallinckrodt stock had significantly more downside than Valeant and was a far "worse" offender of the reimbursement system.

9.     Shares of Mallinckrodt immediately dropped 17%, from $69.89 per share on November 6, 2015 to $58.01 per share on November 9, 2015, the biggest one-day drop since the Company was spun-off from Covidien plc in 2013.   The November 9th stock drop wiped out $1.25 billion in Company market capitalization.

10.     On March 15, 2016, Citron issued another statement on Twitter, this time emphasizing that the market was beginning to realize that owning Mallinckrodt stock was as risky as owning Valeant.   During an appearance on CNBC's *Fast Money* on that same date, Citron's CEO, Andrew Left, stressed that Mallinckrodt made Valeant look like a "choirboy" and referred to Acthar as the "poster child" of price gouging.

11.     In response to Citron's accusations, Mallinckrodt stock plunged 20% over a two-

day period, from a close of $69.61 on March 14, 2016 to a close of $55.69 per share on March 16, 2016. The March 14th through 16th stock drop wiped out nearly $1.5 billion in Company market capitalization.

12.     The full extent of Acthar's reliance on Medicare and Medicaid reimbursements was fully revealed on November 16, 2016, when Citron published a report (the "Citron Report") accusing the Company and Trudeau of securities fraud in connection with Trudeau's representations on the October 6, 2015 conference call.   Based on information published by the Centers for Medicare and Medicaid Services ("CMS") on November 14, 2016, the Citron Report revealed that Medicare and Medicaid, respectively, paid approximately $504 million and $144.6 million for Acthar in 2015, payments that collectively amounted to 61.32% of Acthar's total 2015 revenue.

13.     In reaction to the Citron Report, Mallinckrodt's stock price plummeted 18.4%, falling from a close of $67.80 per share on November 15, 2016 to a close of $55.32 per share on November 17, 2016. The November 15th through 17th stock drop wiped out $1.31 billion in Company market capitalization.

14.     Then, on January 18, 2017, Mallinckrodt stunned investors by disclosing that it had been charged by the Federal Trade Commission ("FTC") with unfair methods of competition and acts of monopolization in violation of the Sherman Act.   The FTC complaint alleged that Mallinckrodt engaged in anticompetitive conduct by extinguishing a nascent competitive threat to Acthar in order to maintain its monopoly.   As a result of the FTC action, Mallinckrodt was forced to pay a significant fine of $100 million and, more importantly, was forced to spin-off the rights to Acthar's competitor drug to a new company, which would result in Acthar facing a low-cost competitor for the first time.

15.     The news of the settlement and the fact that Mallinckrodt was losing its ACTH monopoly in the U.S. rattled the market and caused the Company's stock price to decline 5.85%, from a close of $49.42 per share on January 17, 2017 to a close of $46.53 per share on January 18, 2017.   The January 18th stock drop wiped out over $300 million in Company market capitalization.

16.     As further detailed below, throughout the Class Period, Defendants made false and misleading statements and failed to disclose material adverse facts about the long-term sustainability of the Company's monopolistic Acthar revenues and the exposure of Acthar to Medicare and Medicaid reimbursement rates.   Specifically, Defendants constantly touted that Acthar "has limited direct competition due to the unique nature of the product" when, in reality, Acthar's competitive advantage was the product of Mallinckrodt's monopolist effort to prevent alternative ACTH treatments from being introduced into the U.S. marketplace.   In addition, Company executives misrepresented that the percentage of Acthar revenues derived from Medicare and Medicaid was "a little higher than" 25%.   As would later be disclosed, Medicare and Medicaid reimbursements account for over 60% of Acthar's revenue.

17.     As a direct result of Defendants' wrongful actions, Mallinckrodt's common stock traded at artificially inflated prices throughout the Class Period.

18.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

19.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

21.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) because the Company conducts a substantial amount of business through this District, and a substantial part of the events giving rise to these claims took place in this District.   Specifically, the settlement between the FTC and Mallinckrodt was filed in this District.   *See* Joint Mot. for Entry of Stipulated Order for Perm. Inj. & Equitable Monetary Relief, *Federal Trade Comm'n, et al., v. Mallinckrodt ARD Inc., et al.*, No. 1:17-cv-00120,  ECF No. 2 (D.D.C. Jan. 18, 2017).

22.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

23.    Plaintiff Fulton County Employees' Retirement System, as set forth in the accompanying certification, incorporated by reference herein, purchased Mallinckrodt common stock during the Class Period and suffered damages as a result of the federal securities law violations  and the false and/or misleading  statements and/or material omissions  alleged herein.

24.     Defendant Mallinckrodt plc is a corporation organized under the laws of Ireland, and is based in Staines-upon-Thames, England.  Mallinckrodt maintains its U.S. headquarters at 675 McDonnell Blvd., St. Louis, MO 63042.  Mallinckrodt's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "MNK."

25.     Defendant Mark Trudeau was, at all relevant times, Chief Executive Officer ("CEO") and President of Mallinckrodt.

26.     Defendant Matthew K. Harbaugh ("Harbaugh") was, at all relevant times, Vice President and Chief Financial Officer ("CFO") of Mallinckrodt.

27.     Defendants Trudeau and Harbaugh are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Mallinckrodt's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, and were the result of the collective actions of the Individual Defendants.

7

IV.     **SUBSTANTIVE ALLEGATIONS**

A.      **The Fraud Begins: Mallinckrodt Acquires Questcor**

28.     Mallinckrodt is a specialty pharmaceutical company that develops, manufactures, markets and distributes branded and generic pharmaceutical products and therapies.   The Company was spun-off from Covidien plc in June 2013 and began trading on the NYSE on July 1, 2013.

29.     Described as a "serial acquirer" and the "poster child" of price gouging, Mallinckrodt acquired numerous specialty pharmaceutical companies subsequent to its spin-off in June 2013.   The strategy behind these acquisitions was simple: acquire old drugs with little competition and immediately increase their price, often with the federal government and taxpayers footing the bill.

30.     On April 7, 2014, Mallinckrodt announced that it had entered into a definitive merger agreement under which the Company would acquire Questcor Pharmaceuticals, Inc. ("Questcor") for approximately $5.6 billion. At the time of the acquisition, Mallinckrodt was struggling to turn a profit.   The sole purpose of the acquisition was to add Acthar to its drug portfolio, a drug that has been around since the 1950s and is controversial because clinical trials demonstrating the drug's efficacy are limited.   However, because of Acthar's unique nature as a therapy of last resort for several rare diseases, Acthar had limited direct competition in the U.S. and was a perfect candidate for substantial price increases.

31.     Questcor originally acquired Acthar from Aventis Pharmaceutical, Inc. in 2001. At the time, the price of Acthar was $40 per vial.   Questcor and Mallinckrodt have since increased Acthar's price to over $34,000 per vial—an 85,000% increase.   A course of Acthar treatment for infantile spasms ("IS") requires multiple vials and can cost well over $100,000.

8

32.     On June 11, 2014, Questcor received a subpoena and Civil Investigative Demand ("CID") from the FTC seeking documents and information regarding the FTC's investigation into whether Questcor's acquisition of certain rights to develop, market, manufacture, distribute, sell and commercialize Synacthen from Novartis AG ("Novartis") violates antitrust laws.

33.     In Europe, Canada and other parts of the world, physicians treat patients suffering from IS and related conditions with a synthetic ACTH drug called Synacthen.   Until June 2013, Novartis marketed and sold Synacthen abroad at a fraction of Acthar's price.

34.     In 2011, Novartis opted to sell the rights to market Synacthen in the United States, a drug viewed by Questcor as posing a significant threat to Acthar's competitive advantage.   In June 2013, Questcor outbid other companies to acquire the U.S. rights to Synacthen in a move aimed at protecting its monopoly over ACTH drugs.    By acquiring Synacthen, Questcor prevented its competitors from obtaining FDA approval of an alternative ACTH treatment, solidifying its monopoly in the process. After Mallinckrodt acquired Questcor in 2014, Mallinckrodt took over ownership of the monopoly.

35.     Under the terms of the license agreement with Novartis, Mallinckrodt is obliged to make annual payments of $25 million until such time as the Company obtains FDA approval of Synacthen.   If and when FDA approval is obtained, Novartis would then be entitled to an annual royalty based on a percentage of Synacthen's sales in the U.S.

**B.     Defendants' Materially False and Misleading Statements**

36.     The Class Period begins on July 14, 2014, when Questcor and Mallinckrodt each filed a joint definitive proxy statement with the SEC in anticipation of shareholder votes on the pending merger.   The FTC's investigation, including the subpoena received by Questcor on June

11, 2014, was notably absent from Questcor and Mallinckrodt's definitive proxies, which listed a

litany of risk factors for Mallinckrodt relating to Acthar and Synacthen, as follows:

> These factors include risks and uncertainties related to, among other things: general economic conditions and conditions affecting the industries in which Mallinckrodt and Questcor operate; the commercial success of Mallinckrodt's and Questcor's products, including H.P. Acthar® Gel; Mallinckrodt's and Questcor's ability to protect intellectual property rights; the parties' ability to satisfy the merger agreement conditions and consummate the merger on the anticipated timeline or at all; the availability of financing, including the financing contemplated by the debt commitment letter, on anticipated terms or at all; Mallinckrodt's ability to successfully integrate Questcor's operations and employees with Mallinckrodt's existing business; the ability to realize anticipated growth, synergies and cost savings; Questcor's performance and maintenance of important business relationships; the lack of patent protection for Acthar, and the possible FDA approval and market introduction of additional competitive products; Questcor's reliance on Acthar for substantially all of its net sales and profits; Questcor's ability to continue to generate revenue from sales of Acthar to treat on-label indications associated with nephrotic syndrome, multiple sclerosis, infantile spasms or rheumatology-related conditions, and Questcor's ability to develop other therapeutic uses for Acthar; volatility in Questcor's Acthar shipments, estimated channel inventory, and end-user demand; an increase in the proportion of Questcor's Acthar unit sales comprised of Medicaid-eligible patients and government entities; Questcor's research and development risks, including risks associated with Questcor's work in the areas of nephrotic syndrome and Lupus, and Questcor's efforts to develop and obtain FDA approval of Synacthen Depot; Mallinckrodt's ability to receive procurement and production quotas granted by the DEA; Mallinckrodt's ability to obtain and/or timely transport molybdenum-99 to Mallinckrodt's technetium-99m generator production facilities; customer concentration; cost-containment efforts of customers, purchasing groups, third-party payors and governmental organizations; Mallinckrodt's ability to successfully develop or commercialize new products; competition; Mallinckrodt's ability to achieve anticipated benefits of price increases; Mallinckrodt's ability to integrate acquisitions of technology, products and businesses generally; product liability losses and other litigation liability; the reimbursement practices of a small number of large public or private issuers; complex reporting and payment obligations under healthcare rebate programs; changes in laws and regulations; conducting business internationally; foreign exchange rates; material health, safety and environmental liabilities; litigation and violations; information technology infrastructure; and restructuring activities.

37.     The statements referenced in ¶ 36 were materially false and/or misleading because

they misrepresented and failed to disclose adverse facts pertaining to the Company's future

business prospects and operations which were then known to Defendants or recklessly disregarded by them.   Specifically, Defendants failed to disclose that Acthar's financial viability was tied in large part to monopolistic and anticompetitive actions by Questcor aimed at preventing a synthetic version of ACTH from reaching the U.S. market.   Moreover, the Company failed to disclose that Questcor's illegal anticompetitive conduct was under investigation by the FTC.

38.    On August 14, 2014, the shareholders for both Questcor and Mallinckrodt approved the merger.

39.    On November 25, 2014, Mallinckrodt filed its Annual Report on Form 10-K for the fiscal year ended September 26, 2014 ("2014 10-K") representing that Acthar "has limited direct competition due to the unique nature of the product" and that "Acthar's commercial durability therefore relies partially upon product formulation trade secrets, confidentiality agreements and trademark and copyright laws." The 2014 10-K also stated:

> [F]ollowing our acquisitions of Cadence and Questcor, both of which were completed in fiscal 2014, we expect that a small number of products, most notably Acthar and to a lesser extent, Ofirmev, will represent a significant percentage of our net sales. Our ability to maintain and increase net sales from these products depends on several factors, including:
>
> - our ability to increase market demand for products through our own marketing and support of our sales force;
>
> - our ability to implement and maintain pricing actions and continue to maintain or increase market demand for these products;
>
> - our ability to maintain confidentiality of the proprietary know-how and trade secrets relating to Acthar;
>
> - our ability to maintain and defend the patent protection and regulatory exclusivity of Ofirmev;
>
> - our ability to continue to procure a supply of Acthar and Ofirmev from internal and third-party manufacturers in sufficient quantities and at

11

acceptable quality and pricing levels in order to meet commercial demand;

- our ability to maintain fees and discounts payable to the wholesalers and distributors and group purchasing organizations, at commercially reasonable levels;

- whether the Federal Trade Commission ("FTC"), Department of Justice ("DOJ") or third parties seek to challenge and are successful in challenging patents or patent-related settlement agreements or our sales and marketing practices;

- warnings or limitations that may be required to be added to FDA-approved labeling;

- the occurrence of adverse side effects related to or emergence of new information related to the therapeutic efficacy of these products, and any resulting product liability claims or product recalls; and

- our ability to achieve hospital formulary acceptance, and maintain reimbursement levels by third-party payors.

Moreover, net sales of Acthar may also be materially impacted by the decrease in the relatively small number of prescriptions written for Acthar as compared to other products in our portfolio, given Acthar's use in treating rare diseases. Any disruption in our ability to generate net sales from Acthar could have an adverse impact on our business, financial condition, results of operations and cash flows.

40.    The statements referenced in ¶ 39 were materially false and misleading because Acthar's "limited direct competition" and "commercial durability" was in fact due to Mallinckrodt's anticompetitive practices in preventing Synacthen from reaching the U.S. market, as noted by the FTC.  By making these assertions, the Company artificially inflated Acthar's revenue and growth prospects, as Mallinckrodt's ownership of Synacthen thwarted a competing product from entering the market and pressuring Acthar's pricing.  Defendants thus failed to disclose that the Company's business model and long-term growth strategy hinged on illegal, monopolistic conduct, a practice the FTC would later force Mallinckrodt to abandon.

41.    In its 2014 10-K, Mallinckrodt disclosed for the first time that it was under investigation by the FTC for possible violations of antitrust laws.  The 2014 10-K stated:

"On June 11, 2014, Questcor received a subpoena and Civil Investigative Demand ("CID") from the Federal Trade Commission ("FTC") seeking documentary materials and information regarding the FTC's investigation into whether Questcor's acquisition of certain rights to develop, market, manufacture, distribute, sell and commercialize Synacthen Depot from Novartis violates the antitrust laws."

42.     With respect to Medicare and Medicaid reimbursement levels, the 2014 Form 10-K asserted that "federal and state governments may continue to enact measures in the future aimed at containing or reducing payment levels for prescription pharmaceuticals paid for in whole or in part with government funds. We cannot predict the nature of such measures, which could have material adverse consequences for the pharmaceutical industry as a whole and, consequently, also for us."

43.     The statements referenced in ¶ 42 were materially false and/or misleading because they failed to disclose that Mallinckrodt faced extreme exposure to reductions in Medicare and Medicaid reimbursement levels given Acthar's exorbitant reliance on federally funded health care programs.

44.     On August 4, 2015, Mallinckrodt reported financial results for the quarter ended June 26, 2015.   Mallinckrodt not only reported revenue that fell well short of analyst expectations, but disclosed that Acthar's sales growth would be much lower than expected moving forward.   During a conference call on that same day, Defendant Trudeau emphasized that the Company was facing a great deal of pressure from health insurance companies and other payers over the cost of Acthar and warned that a string of consolidation in the health insurance industry could make the situation even more difficult.   To that effect, Defendant Trudeau asserted:

Yeah. So, first of all, let me say that we're quite pleased with our performance for Acthar in the quarter, $269 million for the quarter, that's an all-time record quarter for the product. And we're pleased that we're continuing to be able to drive growth, particularly given the fact that last year's third quarter was a particularly strong quarter when it was in the previous owner's hands.

**We're very encouraged by the promotional effort behind Acthar, but one of the things we are experiencing certainly is a more difficult payer environment certainly then was the case a year ago. And that's really what's changing our perspective with regards to the long-term prospects of Acthar. As I mentioned earlier, we anticipate long term that Acthar will be growing in the mid-single to low-double-digit range over the next couple years.**

We're very encouraged by the fact, though, that we're making now very good progress with payers. We're having, I think, very productive dialogue with payers and the result of that is what we announced this morning, is that we've been put on at least one major payer's preferred drug list for Acthar which is a significant event for us. And we continue to have dialogue with a variety of additional payers, primarily around the database behind Acthar and the appropriate positioning of the product as it's used in its variety of indications in autoimmune and rare diseases.

45.     In reaction to the August 4, 2015 disclosures, Mallinckrodt's stock price declined $17.48 per share or 14%, from a close of $124.21 on August 3, 2015 to a close of $106.73 on August 4, 2015.

46.     On October 6, 2015, Mallinckrodt held a guidance conference call with analysts and investors.   During the conference call, analyst Jason Gerberry of Leerink Partners asked Defendant Trudeau: "What is your Acthar exposure to Medicare?"  In response, Trudeau stated:

So with regards to your question on Medicare exposure to Acthar, a couple of things. **One, if we look at our overall business, the combined proportion of our business that goes through Medicare and Medicaid combined it's about a quarter of our business, roughly. Acthar is maybe a little higher than that.** But in general, our business is about a quarter.

47.     During the October 6th conference call, Defendant Trudeau also assured investors that the Company was not engaging in any conduct that could jeopardize Acthar:

I think the important thing to understand and maybe what's behind the question is there have been some discussions publicly about whether or not Medicare patients

14

would be exposed to the same type of rebates or discounts that Medicaid patients experience or that Medicare would be negotiating directly drug prices with the industry.

I think this is a concept that's been discussed many, many times over the last years. I think one of the things that is quite clear that Medicare Part D in particular has been a pretty successful federally funded program. And so while there have been discussions about changing Medicare Part D, I think typically going back to history and showing the effectiveness of that program has moved people away from that.

48.    The statements referenced in ¶¶ 46-47 were materially false and/or misleading because they misrepresented Acthar's actual reliance on Medicare and Medicaid reimbursements.  The proportion of Acthar sales attributable to federal reimbursements was in fact much higher than 25%, as Medicare payments alone comprised approximately 48% of Acthar's total 2015 revenue – combined, Medicare and Medicaid comprised over 60% of Acthar's total 2015 revenue.

49.    On November 9, 2015, a few weeks after Trudeau's October 6, 2015 comments, Citron stated on Twitter that Mallinckrodt stock had significantly more downside than Valeant and was a far "worse" offender of the reimbursement system.

50.    Shares of Mallinckrodt immediately dropped 17% – from $69.89 per share on November 6, 2015 to $58.01 per share on November 9, 2015 – the biggest one-day drop since the Company was spun-off from Covidien in 2013.  The November 9th stock drop wiped out $1.25 billion in Company market capitalization.

51.    On November 10, 2015, Defendant Trudeau rejected Citron's aspersions and proclaimed that "the facts [Citron] quoted were mostly, if not completely wrong" and "we are fully confident in our business model and remain focused on executing our long-term growth strategy."

52.    On November 24, 2015, Mallinckrodt filed its Annual Report on Form 10-K for

the fiscal year ended September 25, 2015 ("2015 10-K") representing that Acthar "has limited direct competition due to the unique nature of the product" and that "Acthar's commercial durability therefore relies partially upon product formulation trade secrets, confidentiality agreements and trademark and copyright laws." The 2015 10-K also stated:

> Our ability to maintain and increase net sales from these products depends on several factors, including:
>
> - our ability to increase market demand for products through our own marketing and support of our sales force;
>
> - our ability to implement and maintain pricing and continue to maintain or increase market volume demand for these products;
>
> - our ability to maintain confidentiality of the proprietary know-how and trade secrets relating to Acthar;
>
> - our ability to maintain and defend the patent protection and regulatory exclusivity of Ofirmev and Inomax;
>
> - our ability to continue to procure raw materials or finished goods, as applicable, of Acthar, Ofirmev, Inomax and Therakos immunotherapy from internal and third-party manufacturers in sufficient quantities and at acceptable quality and pricing levels in order to meet commercial demand;
>
> - our ability to maintain fees and discounts payable to the wholesalers and distributors and group purchasing organizations, at commercially reasonable levels;
>
> - whether the FTC, DOJ or third parties seek to challenge and are successful in challenging patents or patent-related settlement agreements or our sales and marketing practices;
>
> - warnings or limitations that may be required to be added to FDA-approved labeling;
>
> - the occurrence of adverse side effects related to or emergence of new information related to the therapeutic efficacy of these products, and any resulting product liability claims or product recalls; and
>
> - our ability to achieve hospital formulary acceptance, and maintain reimbursement levels by third-party payers.

Moreover, net sales of Acthar may also be materially impacted by the decrease in the relatively small number of prescriptions written for Acthar as compared to other products in our portfolio, given Acthar's use in treating rare diseases. Any disruption in our ability to generate net sales from Acthar could have an adverse impact on our business, financial condition, results of operations and cash flows.

53.     The statements referenced in ¶¶ 51-52 were materially false and misleading because Acthar's "limited direct competition" and "commercial durability" was in fact due to Mallinckrodt's anticompetitive practices in preventing Synacthen from reaching the U.S. market, as noted by the FTC.  By making these assertions, the Company artificially inflated Acthar's revenue and growth prospects, as Mallinckrodt's ownership of Synacthen thwarted a competing product from entering the market and pressuring Acthar's pricing.  Defendants thus failed to disclose that the Company's business model and long-term growth strategy hinged on illegal, monopolistic conduct, a practice the FTC would later force Mallinckrodt to abandon.

54.     On March 15, 2016, Citron issued another statement on Twitter, this time emphasizing that the market was beginning to realize that owning Mallinckrodt stock was as risky as owning Valeant.  On the afternoon of March 15th, Citron's CEO, Andrew Left, during an appearance on CNBC's *Fast Money*, asserted that Mallinckrodt made Valeant look like a "choirboy" because it was "dependent on one drug, close to let's say 50 percent of their EBITDA, depends on what metric you want to look at, is dependent on one particular drug.  Not let's say 30 that Valeant has."  Left also referred to Acthar, a drug he described as having "no real clinical testing," as the "poster child" of price gouging.  Defendant Trudeau also appeared on the *Fast Money* segment and attempted to defend Mallinckrodt from Left's attacks, stating: "First and foremost, Mallinckrodt is a well-diversified, strong company. We're transparent. Our strength is both operational and financial."

55.     In response to Citron's accusations, Mallinckrodt's stock plunged 20% over a

17

two-day period, from a close of $69.61 on March 14, 2016 to a close of $55.69 per share on March 16, 2016. The March 14th through 16th stock drop wiped out another nearly $1.5 billion in Company market capitalization.

### C.     The Full Extent of Mallinckrodt's Fraud Is Finally Revealed

56.     The full extent of Acthar's reliance on Medicare and Medicaid reimbursements came to light on November 16, 2016, when Citron published a report accusing the Company and Trudeau of securities fraud in connection with Trudeau's representations on the October 6, 2015 conference call.

57.     Based on information published by CMS on November 14, 2016, the Citron Report revealed that Medicare and Medicaid, respectively, paid approximately $504 million and $144.6 million for Acthar in 2015, payments that collectively amounted to 61.32% of Acthar's total 2015 revenue.    Indeed, Medicare's payments alone comprised approximately 48% of Acthar's total 2015 revenue.    According to Citron, these figures demonstrated that Trudeau had lied to investors when he indicated that Medicare and Medicaid accounted for only "a little bit higher" than 25% of Acthar's sales.  To this effect, the Citron Report asserted:

> As we now learn, the concentration for Acthar paid by Medicare **has ballooned to 61% as Trudeau lied to Wall Street**.

> At the time, Trudeau must have calculated the investing public would never know the damming truth, but only two months later in response to public outrage, this information  was on its way to being revealed to the public.

> For the year 2015, Medicare and Medicaid Spending is not merely "a little bit" higher than 25%.  In fact, it is over 61% of Acthar sales.

**H.P. Acthar CMS Spending**

| (in millions) | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|
| HP Acthar Spending by Medicare (CMS) | $49.457 | $141.452 | $262.582 | $391.190 | $503.999 |
| y/y growth | | 186.01% | 85.63% | 48.98% | 28.84% |
| HP Acthar Spending by Medicaid (CMS) | $40.007 | $57.410 | $83.939 | $126.837 | $144.566 |
| y/y growth | | 43.50% | 46.21% | 51.11% | 13.98% |
| Total H.P. Acthar spending combined (CMS) | $89.464 | $198.861 | $346.520 | $518.027 | $648.565 |
| y/y growth | | 122.28% | 74.25% | 49.49% | 25.20% |
| % of Acthar Revenue by CMS | 41.01% | 39.05% | 45.51% | 60.20% | 61.32% |
| Calculated cost per beneficiary by Medicare | $57,980 | $89,357 | $108,014 | $133,421 | $162,371 |
| y/y growth | | 54.12% | 20.88% | 23.52% | 21.70% |
| Calculated cost per beneficiary Medicaid | $41,458 | $44,060 | $41,533 | $45,331 | $44,102 |
| y/y growth | | | | | |
| Combined calculated cost | $49,210 | $68,906 | $77,835 | $90,406 | $101,624 |

58.     In reaction to the Citron Report, Mallinckrodt's stock price plummeted 18.4%, from a close of $67.80 per share on November 15, 2016 to a close of $55.32 per share on November 17, 2016. The November 15th through 17th stock drop wiped out $1.31 billion in Company market capitalization.

59.     During a conference call with investors on November 29, 2016, Trudeau was forced to admit that "Acthar now represents a significantly greater proportion of our operating income than one-third." Trudeau also acknowledged that Acthar's "patient mix has shifted more toward older patients, many of whom are covered by Medicare." During the November 29 conference call, analysts highlighted Trudeau's earlier misleading statements about the Company's Medicare exposure for Acthar. For example, Gregg Gilbert of Deutsche Bank asked:

Follow-up question for Hugh on the amount of Acthar business that's paid for by the government. Do you see any risks associated with the amounts or the growth in that channel that would trigger a process or extra scrutiny by the government? I think there's obviously been some controversy in the market not only about your potential mischaracterization of the channel mix which I assume you disagree with, but I'm curious whether there is any unique risk with having that much business and potential additional growth in Medicare versus other channels?

60.     The news of the Company's ever-increasing exposure to Medicare caused Mallinckrodt's stock price to drop an additional 9.1%, from a close of $57.67 per share on November 28, 2016 to a close of $52.42 per share on November 29, 2016. The November 29th stock drop wiped out an additional $550 million in Company market capitalization.

61.     On November 30, 2016, the Company essentially admitted the falsity of Trudeau's October 6, 2015 statements when Hugh O'Neill, an Executive Vice President and President of Autoimmune and Rare Diseases at the Company, indicated: "Our portfolio has shifted a little bit into the mid-40s as it relates to Medicare reimbursement for the product versus where it was a year and a half, two years ago which was more in that low, mid-30s."

62.     Then, on January 18, 2017, the FTC and the states of Alaska, Maryland, New York, Texas, and Washington sued Mallinckrodt for engaging in anticompetitive behavior by preventing Synacthen from reaching the U.S. market.  According to the FTC, Questcor's sole purpose in purchasing Synacthen was to prevent alternative bidders from selling the drug in the U.S.  With the exception of Questcor, all of the companies who bid on Synacthen were expected to sell the drug for a profit and at a fraction of Acthar's price.  The sale of Synacthen to one of Questcor's competitors would have established competition in the ACTH marketplace, resulting in significantly lower drug prices for consumers.

63.     Immediately after the filing of the complaint, the FTC announced that Mallinckrodt had agreed to pay $100 million to settle the claims alleged against the Company.

The $100 million fine represented 43% of Mallinckrodt's total operating income (before taxes) for its 2016 fiscal year.   In addition, and more importantly, Mallinckrodt agreed to license Synacthen to a competitor who could then commercialize the drug in the U.S. to treat IS and nephrotic syndrome.

64.     The news of the settlement and the fact that Mallinckrodt was losing its ACTH monopoly in the U.S. rattled the market and caused the Company's stock price to decline 5.85% from a close of $49.42 per share on January 17, 2017 to a close of $46.53 per share on January 18, 2017.   The January 18th stock drop wiped out over $300 million in Company market capitalization.

## V.     CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Mallinckrodt securities during the Class Period and who were damaged thereby (the "Class").   Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Mallinckrodt and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

66.     The members of the Class are so numerous that joinder of all members is impracticable.   While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Throughout the Class Period, Mallinckrodt's securities were actively traded on the NYSE (an open and efficient market) under

the symbol "MNK." Millions of Mallinckrodt shares were traded publicly during the Class Period on the NYSE. As of February 3, 2017, Mallinckrodt had 104,694,686 shares of common stock outstanding. Record owners and the other members of the Class may be identified from records maintained by Mallinckrodt and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

67. Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

68. Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class and securities litigation.

69. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b) whether Defendants participated in and pursued the common course of conduct complained of herein;

c) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, and prospects of Mallinckrodt;

d)      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Mallinckrodt;

e)      whether the market price of Mallinckrodt common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)      the extent to which the members of the Class have sustained damages and the proper measure of damages.

70.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.    UNDISCLOSED ADVERSE FACTS

71.      The market for Mallinckrodt's securities was an open, well-developed and efficient market at all relevant times.  As a result of these materially false and misleading statements and failures to disclose described herein, Mallinckrodt's securities traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased or otherwise acquired Mallinckrodt's securities relying upon the integrity of the

market price of the Company's securities and market information relating to Mallinckrodt, and have been damaged thereby.

72.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Mallinckrodt's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business, accounting, financial operations and prospects, as alleged herein.

73.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading  statements about Mallinckrodt's  financial well-being  and prospects.

74.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements made during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's securities at artificially  inflated prices, thus causing the damages complained of herein.

## VII.   LOSS CAUSATION

75.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Mallinckrodt's

securities and operated as a fraud or deceit on Class Period purchasers of Mallinckrodt's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information. When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Mallinckrodt's securities fell precipitously as the prior inflation came out of the Company's stock price. As a result of their purchases of Mallinckrodt's securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

76.     By failing to disclose the true state of the Company's financial statements, investors were not aware of the true state of the Company's financial status. Therefore, Defendants presented a misleading picture of Mallinckrodt's business practices and procedures. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Mallinckrodt to conceal the truth.

77.     Defendants' false and misleading statements had the intended effect and caused Mallinckrodt's common stock to trade at artificially inflated levels throughout the Class Period. The stock price drop discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

78.     The decline in the price of Mallinckrodt's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Mallinckrodt's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially

inflate the prices of Mallinckrodt's securities and the subsequent decline in the value of Mallinckrodt's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.   SCIENTER ALLEGATIONS

79.     As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

80.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Mallinckrodt, their control over, receipt and/or modification of Mallinckrodt's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Mallinckrodt, participated in the fraudulent scheme alleged herein.

## IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

81.     At all relevant times, the market for Mallinckrodt's securities was an efficient market for the following reasons, among others:

a)     Mallinckrodt securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

b)     As a regulated issuer, Mallinckrodt filed periodic public reports with the SEC and the NYSE;

c)     Mallinckrodt securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

d)     Mallinckrodt regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

82.     As a result of the foregoing, the market for Mallinckrodt's securities promptly digested current information regarding Mallinckrodt from all publicly available sources and reflected such information in Mallinckrodt's stock price.  Under these circumstances, all purchasers of Mallinckrodt's securities during the Class Period suffered similar injury through their purchase of Mallinckrodt's securities at artificially inflated prices and a presumption of reliance applies.

83.     A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Mallinckrodt's business practices, financial results and condition, and the Company's internal controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable

investor might have considered such information important in the making of investment decisions.

## X.    NO SAFE HARBOR

84.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.   The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

85.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Mallinckrodt  who knew that the statement was false when made.

## XI.    COUNTS AGAINST DEFENDANTS

### COUNT I
### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

86.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This claim is asserted against all Defendants.

87.     During the Class Period, Mallinckrodt and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Mallinckrodt securities; and (iii) cause Plaintiff and the other members of the Class to purchase Mallinckrodt securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

88.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Mallinckrodt securities in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.   The Individual Defendants are also sued herein as controlling persons of Mallinckrodt, as alleged herein.

89.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and

performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

90.     Mallinckrodt and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Mallinckrodt as specified herein.  These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Mallinckrodt's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about Mallinckrodt and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Mallinckrodt's securities during the Class Period.

91.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other, and

30

were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

92.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing Mallinckrodt's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its common stock.   As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

93.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Mallinckrodt securities was artificially inflated during the Class Period.   In ignorance of the fact that the market price of Mallinckrodt shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known

to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Mallinckrodt securities during the Class Period at artificially inflated high prices and were damaged thereby.

94.    At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Mallinckrodt, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired Mallinckrodt securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

95.    By virtue of the foregoing, Mallinckrodt and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

96.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against The Individual Defendants

97.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

98.    The Individual Defendants were and acted as controlling persons of Mallinckrodt within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's

operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

99.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

100.     As set forth above, Mallinckrodt and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)     Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)      Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)      Awarding such other relief as this Court deems appropriate.

## XIII.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: March 23, 2017            Respectfully Submitted,

/ s / Daniel S. Sommers

**COHEN MILSTEIN SELLERS & TOLL PLLC**

Steven J. Toll (ID: 225623)
Daniel S. Sommers (ID: 416549)
Elizabeth A. Aniskevich (ID: 994603)
1100 New York Avenue, N.W. / Fifth Floor
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
eaniskevich@cohenmilstein.com

**SAXENA WHITE P.A.**

Maya Saxena
Joseph E. White, III
Lester R. Hooker
5200 Town Center Circle
Suite 601
Boca Raton, FL 33486
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

-and-

Steven B. Singer

34

4 West Red Oak Lane, Suite 312
White Plains, New York 10604
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com

***Counsel for Plaintiff Fulton County Employees'
Retirement System***